

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 10, 2014**

*United States Bankruptcy Judge*

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NNN 3500 MAPLE 26, LLC, et al. | § | CASE NO. 13-30402-HDH-11 |
| | § | |
| Debtors. | § | |
| | § | |

## MEMORANDUM OPINION ON PLAN CONFIRMATION

This case presents primarily a legal issue regarding the confirmability of two proposed plans that are strenuously opposed by the secured creditor. Finding that both plans fail to meet the legal requirements imposed by 11 U.S.C. § 1124(2) for reinstatement, confirmation is denied.

### PROCEDURAL AND FACTUAL HISTORY

This court has before it two proposed plans of reorganization: one filed by the Debtor[1] ("Debtor's Plan") and another filed by a party that acquired a claim in the case, Strategic

---

[1] The court will use the term Debtor in the opinion. However, there are actually 27 Debtors, all tenants in common, and the cases are consolidated procedurally.

Acquisition Partners, LLC ("SAP" proposing "SAP's Plan").  U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2006-C23 (the "Trust"), by and through CWCapital Asset Management LLC ("CWCAM"), solely in its capacity as Special Servicer, opposes the confirmation of either of these plans and instead requests that this court allow it to foreclose on a well-known commercial building near downtown Dallas located at 3500 Maple Ave. (the "Property").  This court held a confirmation hearing on these Plans over the course of several days.  All parties were well represented in the process, introduced substantial evidence in support of their positions, and extensively briefed the legal issues.

I. Background Facts

In December 2005, Wachovia Bank, National Association (the "Original Lender") made a loan in the original principal amount of $47,000,000.00 (the "Loan" or "Trust Loan" evidenced by certain "Loan Documents") to NNN 3500 Maple LLC and NNN 3500 Maple VF 2003, LLC (together, the "Original Borrowers") secured by a promissory note (the "Note").  The Note is secured by a Deed of Trust, Security Agreement, and Fixture Filing on the Property.  The Property securing the Note is located in a very nice part of Dallas.  However, the building needs updating, occupancy has declined, and the Loan is in default.  The largest tenant is Heritage Auctions, a nationally known firm.  Heritage is an unhappy tenant at this time and announced objections (without filing anything by way of a formal objection) to both Plans and stated its preference for the stay to lift to allow CWCAM to foreclose.

One other objection to the Plans was filed by Maple Avenue Tower, LLC ("MAT"). MAT purchased a claim, which under either Plan would be paid in full. MAT seeks to purchase the Property at foreclosure or after foreclosure from the Trust. Because it would be paid under either Plan, its objection is overruled.

II.     The Bankruptcy Filings

The road to a confirmation of any plan regarding the Property has been long and winding. The Property is owned by 33 tenants in common ("TICs") (collectively, the "Borrowers").[2] As detailed below, the litigation in bankruptcy court began with the unsuccessful filing of a single TIC.

On November 30, 2012, a single tenant in common owning a 2.125% interest in the property (the "Original Debtor") filed a voluntary chapter 11 petition in the Central District of California (the "Original Case") while a foreclosure sale was scheduled for December 4, 2012. On January 23, 2013, the California Bankruptcy Court transferred venue of the Original Case to this court. This court—concerned with a single TIC interest holder's ability, having no equity in the Property, to successfully propose a plan for the entire Property—granted CWCAM's Motion for Relief from Stay. CWCAM reposted the Property, and on August 29, 2013, 27 of the TICs ("Debtor"), constituting a substantial majority of the TICs, filed a voluntary petition for chapter 11 relief in this court. After some legal skirmishes, this court set deadlines on the Debtor for its disclosure statement and the confirmation hearing to allow these matters to come to a head and to not allow additional delay to CWCAM in exercising its foreclosure rights under Texas law, if a

---

[2] For a discussion on TIC financing and certain tax advantages of using this structure, *see In re Geneva ANHX IV LLC*, 496 B.R. 888, 894 (Bankr. C.D. Ill. 2013) (noting that "[a]lthough taxpayers cannot use a partnership interest as either relinquished property or replacement property in a likekind exchange, this restriction may be avoided by structuring property ownership as a tenancy-in-common.").

plan could not be confirmed within a reasonable period of time. In this court's judgment, the multi-year dispute over this building must conclude.

The court also terminated exclusivity to allow other Plans to be filed and considered. SAP acquired a claim and filed its Plan and proceeded on the same track as the Debtor. As mentioned above, one other party, MAT, also acquired a claim and filed a plan but later withdrew it. After more than a year, the parties are at confirmation.[3]

III.     Overview of Plans and Objections

The Plans are both rather complicated. Outlined below are the major features of the Debtor's Plan, SAP's Plan (collectively, the "Plans"), and CWCAM's objections to both Plans. The plan discussions are limited to the respects in which CWCAM objects to the Plans.

   A. *The Debtor's Plan*

The Debtor's Plan purports to cure and reinstate the Trust Loan in accordance with 11 U.S.C. § 1124(2). Debtor's Plan proposes the creation of a limited liability company ("NewCo"), to which the membership interests of the Debtors and consenting non-Debtor TICs will be transferred. Debtor's Plan also would compel the transfer of the non-consenting, non-Debtor TICs' interests in the Property to the Debtors through either the Call Option made available in the original TIC Agreement among the 33 TICs or through a § 363(h) transfer. Section 12.1 of the Debtor's Plan discharges the Debtor TICs' personal liability.

---

[3] SAP filed a related adversary proceeding seeking declaratory relief for a determination that any defendant in the adversary be deemed a dissenting TIC and an injunction commanding the defendants to transfer to the Debtor all right, title, and interest they have in the Property. Also, Debtor filed an adversary proceeding for authorization to sell the Property under § 363(h) and for declaratory relief to exercise the Call Option under the TIC Agreement. An agreement regarding these suits has been reached, subject to confirmation.

4

Debtor's Plan is to be funded by an $8.5 million "Cash Infusion" and "Additional Equity Contributions" of around $10 million.  Under the Debtor's Plan, the building will undergo substantial rehabilitation.  The Debtors do not anticipate any additional net cash flow during the first two years.  No payments are to be made to the Debtor during the first five years, but the Debtor plans to achieve a 90% occupancy rate during those five years and then sell the Property.  The proceeds of the sale are to be distributed to the members of NewCo under a "waterfall" provided in Debtor's Plan.  According to CWCAM, the Property will have to be sold for as much as $91 million before the TICs receive anything under the Debtor's Plan.  Debtor disputes this figure.

The Debtor's financial advisor, Breakwater Equity Partners LLC ("Breakwater"),[4] originally was to receive a certain "Success Fee" and "Capital Placement Fee," but these aspects of the Plan have been modified.

B.  SAP's Plan

The Debtor's Plan and SAP's Plan are materially different in some respects.  However, SAP's Plan, similar to the Debtor's, in an attempted cure and restatement, will replace the Borrower with NewCo under the Loan Documents.  NewCo will be divided into Class A and Class B membership interests.  Class A will be owned in majority by a to-be-formed affiliate of Artemis Real Estate Partners Fund 1 Acquisition, LLC ("Artemis") and will be minority-owned by 3500 PRG Uptown, LLC ("PRG").  Class B will consist of membership interests held by the

---

[4] Breakwater did not seek employment in this case.  It has been the source of some confusion and consternation in the voting process by sending pre-marked ballots soliciting votes under both SAP and Debtor's Plan, at first against SAP's and for the Debtor's respective Plans.  As the parties have resolved these issues, the Court need not reach them, but only note that Breakwater or its functional equivalent in other bankruptcy cases should not interfere with the voting on a plan of reorganization.

5

TICs that choose the "New Equity Option" (as defined in SAP's Plan). SAP's Plan in Section 4.3.3 purports to preserve personal liability with respect to the Debtor TICs, but only as to defaults after the effective date of the Plan. SAP's Plan also purports to cure and reinstate the Lender's claim, but adds NewCo to the Loan.

Artemis and PRG will pay $9 million in plan funding, $500,000 to capitalize NewCo, and other amounts necessary for capital expenditures. CWCAM argued that the Class A members must receive as much as a 12% internal rate of return ("IRR") for all capital contributions before any amounts are paid to the TICs. SAP disputes these calculations. SAP does not anticipate any net cash flow during the first three years.

The TICs will only receive a distribution after five years upon the sale of the Property. The sale proceeds will be distributed as follows: (1) an amount will be paid to Class A equaling their capital contributions plus a 12% IRR, (2) of the surplus, 80% to the Class A members, and (3) 20% to the TICs. CWCAM claims that the Property will have to be sold for more than $81 million under SAP's Plan for the TICs to receive anything. SAP disputes that figure.

*C. CWCAM's Objections*

CWCAM opposes confirmation of the Debtor's and SAP's Plans on essentially the same grounds. First, CWCAM strenuously takes issue with the proposed reinstatement of the Loan under the Plans. CWCAM argues that the Plans do not really reinstate the Trust Loan as required by Bankruptcy Code § 1124(2) because they alter the Trust's legal, equitable, and contractual rights under the Loan Documents. CWCAM points out that, under the Plans, the ownership interests in and control of the Borrowers and the Property will be transferred from the TICs to NewCo. In other words, both Plans propose to change the fundamental nature of the

6

prepetition borrower and replace it with a new entity, which CWCAM argues alters its rights under the Loan Documents. As a corollary, CWCAM argues that the change in its borrower results in a "change of control" for the TICs, also an alteration of its contractual rights.

Second, CWCAM takes issue with the treatment of the Trust's right to credit bid under the Plans. CWCAM argues that the Plans constitute a "sale" as opposed to a "recapitalization," thus triggering the Trust's right to bid the amount of their debt under Section 363(k) of the Code. The Plans propose to transfer Debtor's interest to NewCo, which had no prior interest in the Debtor or the Property. In addition, Debtor seeks to carry out the transfer of the non-Debtor TICs' interests in the Property through the use of the Call Option or a transfer pursuant to Section 363(h). SAP's Plan works similarly. CWCAM opposes this because it would be free and clear of the Trust's lien in the Property and enjoins the Trust from enforcing its lien on their interests in the Property in satisfaction of the debt owed by these non-Debtor TICs.

Third, CWCAM argues that the Plans fail to comport with certain other requirements of Section 1129(a). Specifically, CWCAM argues that the Plans do not provide adequate means of implementation because the Debtor cannot compel the transfer of the non-Debtor TICs' Property through either Section 363(h) or the Call Option. CWCAM argues that implementation is also not possible because the funding commitment is not binding and necessary operative documents are not complete. CWCAM argues the feasibility of the Plans, stating: there is no binding source of funding, the Plans' projections are not realistic, the Plans enjoin CWCAM from proceeding against the non-Debtor TICs on debts owed to the Trust, there is no impaired class entitled to vote, and the Plans were not proposed in good faith.

## DISCUSSION

I.     Issues Presented

Boiled down, CWCAM's main objections to the Plans necessitate three issues for the court to resolve: (1) whether the Proposed Plans satisfy the cure and reinstatement provisions of § 1124(2), (2) whether the Trust should be allowed to credit bid as it would be allowed to do in a sale by § 363(k) of the Code, and (3) whether the Plans comport with the various confirmation requirements of § 1129(a), particularly feasibility and good faith.

II.     Analysis

*A. Cure and Reinstatement*

With regard to the first issue, Debtor and SAP propose the confirmation of each of their respective plans as being a "cure and reinstatement" plan under § 1124(2) of the Bankruptcy Code. In relevant part, § 1124(2) states that a class of claims or interests is impaired, and thus entitled to vote, unless those claims or interests, notwithstanding any right to demand accelerated payment upon default: (A) cures the default, (B) reinstates the maturity of the claim or interest, (C) compensates the claim or interest holder for damages for relying on the acceleration clause, (D) compensates for nonmonetary defaults, and (E) "does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder." § 1124(2). If a plan can satisfy these requirements, that claim or interest holder will not be considered impaired.

Debtor and SAP are attempting use § 1124(2) to avoid impairing CWCAM—and thus entitling it to vote—and having to deal with the consequences of CWCAM's negative vote. If CWCAM is impaired, the SAP Plan cannot be confirmed because it lacks an accepting impaired class. *See* 11 U.S.C. § 1129(a)(10). The Debtor asserts that it has consenting impaired classes

8

made up of claims by non-Debtor TICs and the holders of membership interests in the Debtors. However, these are insiders and are not included under § 1129(a)(10). *Cf. In re Longview Aluminum, LLC*, 657 F.3d 507, 510 (7th Cir. 2011) (stating that a member of an LLC is analogous to a director of a corporation and a statutory insider pursuant to 11 U.S.C. § 101(31)). Regardless, the record made at the confirmation hearing provided insufficient evidence to support confirmation over CWCAM's objection, if CWCAM is impaired.

Thus, both plans turn on the same question: whether the requirements of § 1124(2) are met. Specifically, CWCAM argues § 1124(2)(E) is not satisfied primarily because the original borrower on the Note will be substituted for NewCo. CWCAM says this alters its legal, equitable, or contractual rights, which is forbidden by § 1124(2)(E), while the Plan Proponents disagree.

The other subsections of § 1124(2) arguably appear to be met. Thus, the legal issue squarely before this court is whether the plans alter the legal, equitable, or contractual rights of CWCAM. This is a case of first impression before this court and there is little controlling case law.

Generally speaking, Congress has broadly defined impairment and carved out narrow exceptions. *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984); *In re Village at Camp Bowie I, L.P.*, 454 B.R. 702, 708 (Bankr. N.D. Tex. 2011). The court in *Madison Hotel Assocs.* noted, looking into the legislative history of § 1124(2), that "a creditor who is prevented from exercising a contractual and/or legal right of acceleration, but who receives the *complete benefit of its original bargain with the debtor*, is 'not impaired' for purposes of Chapter 11 analysis." 749 F.2d at 421 (emphasis added).

Various courts have stated a plan may cure a default by de-accelerating the note, but *any* other change in the arrangement between the debtor and creditor constitutes impairment. *In re Elijah*, 41 B.R. 348, 350 (Bankr. W.D. Mo. 1984); *see In re Smith*, 123 B.R. 863, 866 (Bankr. C.D. Cal. 1991) (holding that creditors were impaired under section 1124(2) because creditors were being paid by a surrender of their collateral, not in cash as originally contemplated by the arrangement). Since the enactment of the Bankruptcy Code, there does not appear to be much on-point analysis regarding whether a fundamental change in the character of the borrower constitutes impairment in this circuit. However, a Fifth Circuit case, *Continental Ins. Co. v. Louisiana Oil Refining Corp.*, 89 F.2d 333 (5th Cir. 1937), addressed this issue under Chapter X of the Bankruptcy Act of 1898. That court stated "[t]he substitution of a new debtor, although solvent, is a fundamental alteration of a creditor's rights." *Id.* at 336. To be clear, that case was interpreting 11 U.S.C.A. § 207(b) of the Act, which established that for a case to be within the "bankruptcy power" of the court, the plan must "include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise." *Id.*

It is true that "altered" and "affected" had different meanings under the Act, and the concept of "impairment" replaced what the Act referred to as "affected." *See In re Barrington Oaks Gen. P'ship*, 15 B.R. 952, 959-60 (Bankr. D. Utah 1981) (discussing the history of the former Act and legislative commentary surrounding the enactment of the Code in relation to impairment). Given the different meanings of "altered" and "affected," and their relation to the current understanding of "impairment," *Continental Ins. Co.* does not squarely answer the issue

10

at hand. Instead, this court must consider, under the current interpretation of "impairment," whether the substitution of a borrower impairs a creditor.

For the reasons to be given below, it is the opinion of this court that the substantial change in the nature of the borrower on the loan documents does impair the creditor-lender in this case. For example, the Loan Documents at issue require the Borrower to be single purpose entities. After confirmation that would not be the case, as the TICs will be subsumed into another entity. Having the borrower be a single purpose entity was bargained for and is a benefit to the lender. Generally, lenders conduct analyses to evaluate the creditworthiness of a particular proposed borrower and input this into the risk factor associated with a particular loan. The results of these analyses often affect the interest rates, periods, penalties, and other terms associated with the loan. A loan is a contract. Substituting a different borrower into the place of the original borrower of a loan is not what the creditor bargained for.

Probably in hindsight CWCAM (or its predecessor) regrets entering into a loan transaction with 33 TICs, as it has caused serial bankruptcy filings and substantial, expensive litigation. Under the Plans, it would now have new, unknown parties with which to deal in the future.

Although it is true that the bankruptcy process inherently alters some rights of creditors via the automatic stay and other provisions, the changes proposed in the Plans are not the type of alteration that should be permitted unless by way of impairment, cramdown, and confirmation over objection. Section 1124(2) is being used in this scenario to prevent the creditor from voting against the plans by attempting to keep the creditor unimpaired. Congress, in enacting § 1124(2), expressly stated:

11

> The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing the default and the assumption of the debt *in accordance with its terms* is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

S. Rep. No. 989, 95th Cong., 2d Sess. 120, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5906 (emphasis added). In the case at bar, the proposed substitution of the borrower is plainly not "in accordance with [the] terms" of the original note. *Id.*

CWCAM also notes that the change in borrower brings with it a change of control. To that point, the original Deed of Trust in Section 2.9 expressly prohibits certain transfers of the Property without the Lender's consent. Specifically, Section 2.9(b) prohibits any "Change of Control," defined as:

> a change in the identity of the individual or entities or group of individuals or entities who have the right, by virtue of any partnership agreement, articles of organization, operating agreement or any other agreement, with or without taking any formative action, to cause Borrower to take some action or to prevent, restrict or impede Borrower from taking some action which, in either case, Borrower could take or refrain from taking were it not for the rights of such individuals.

Exhibit A to CWCAM's Opposition to Confirmation of Amended Plan of Reorganization of SAP.

The court in *In re Young Broad., Inc.*, 430 B.R. 99 (Bankr. S.D.N.Y. 2010) faced a similar issue. In that case, the original credit agreement contained a clause that prohibited change of control. The proposed plan of the unsecured creditors' committee would reinstate the debt, but cause changes in ownership in certain stocks, which held board of directors' voting rights. *Id.* at 110. This would result in a complete restructuring of the corporate governance of the company. The court held that this change of control was not a proper cure and reinstatement under § 1124(2). *Id.* at 115, 120. This is similar to the case at bar because substituting the

12

borrower in the present case would now give NewCo the decision-making ability. The TICs, the original borrowers, are relegated to an inferior role after confirmation.

The Plan Proponents point this court to *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr. N.D. Tex. 2010) as support for confirmation of their respective plans. First, the case at hand is a § 1124(2) case, while *In re Texas Rangers Baseball Partners* was a § 1124(1) case. However, the court there stated that "unlike treatment under section 1124(2), section 1124(1) is prospective: section 1124(1) does not require that a plan provide for the cure of defaults — i.e., recreation of the situation as it was before default." *Id.* at 407. Section 1124(2) does require recreation of the situation pre-default. Replacing the borrower under the loan and changing control simply do not return the debtor to the status quo ante. As stated in *Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 814-15 (6th Cir. 1990) a "loan would be impaired as a matter of law if [the borrower's] obligation to pay the loan was extinguished and a different party substituted to assume the payments." That is certainly the case under the Debtor's Plan, which modifies the personal liability of the TICs and under SAP's Plan, which provides substantial injunctive relief.

SAP and the Debtor attempt to caution the court that if plans like this are not confirmable, then virtually no plans that substitute a party in an obligation would be confirmable. This is plainly not the case. If a plan proponent wishes to cause substantial change in a borrower like this, then the proper method is to use § 1124(1), not § 1124(2), and have other consenting classes. Unfortunately, the case at hand appears to be an attempt to keep the Lender's voice and vote out of the process, when, in fact, the Lender is impaired. There are other methods to

13

approve a plan when substituting the borrower, but using § 1124(2) against a lender when there are no other impaired and consenting classes is not one.

SAP argues that § 1124(2) only requires the lender's rights be preserved *after* the effective date of the plan and that defaults before the effective date simply must be compensated. This is an accurate reading of § 1124(2)(A)-(D), but fails to account for § 1124(2)(E). Subsection (E) requires that the plan "not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest." This portion of the statute makes no mention of "before" or "after" the effective date, but a plain reading indicates that the plan may not alter rights of the lender moving forward. In a technical sense, the lender's rights must be preserved after the effective date, but the rights to which the statute refers are the rights the lender had pre-default, not the lender's rights looking at the effective date moving forward. The Lender in this case, pre-default, had the right to pursue the original Borrower in the event of default and the right to be in contract with the original Borrower, not NewCo. The insertion of this new and very different entity shuffles the deck and amounts to a change of control, something for which the Lender did not bargain upon entering into the loan transaction.

The proposed actions by both Debtor's and SAP's Plans amount to attempts to cure and reinstate the Lender's loan, but do not meet the burden established by § 1124(2). It is the belief of this court that when a creditor's rights are being altered by the substitution of a new and very different borrower into the shoes of the original borrower or when there is a change of control in violation of the Loan Documents, the creditor is impaired and should be allowed some say in this by way of voting. Therefore, this court holds that the proposed substitution of a borrower under

14

a loan or a change in control does impair the creditor by altering its rights and is not a proper "cure and reinstatement" under § 1124(2).

### B.  The Right to Credit Bid

CWCAM argues that the Proposed Plans do not provide for a "recapitalization" of the Trust's loan, but rather a sale of interests in the Property.  CWCAM says that this sale should allow the Trust to credit bid the amount owed under the Note via § 363(k) of the Bankruptcy Code.

CWCAM's argument is that when a Trustee is conducting a § 363(b) sale of "property that is subject to a lien that secures an allowed claim . . . the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property" under § 363(k).  § 363(b), (k).  Although the Plans are not the formal sale context, CWCAM argues that, in effect, this is the exact type of sale that would normally allow a lender to credit bid the amount of its claim.  CWCAM argues the Plans effectuate a sale, instead of a recapitalization, because there is a "transfer of ownership rights in the [d]ebtor and its assets to new owners of those rights in exchange for cash and property" as opposed to a "new form of the previous participation in the enterprise, involving no change of substance of the rights and relations of the interested parties one to another or to the corporate assets."  *See In re Old Prairie Block Owner, LLC*, 464 B.R. 337, 345-46 (Bankr. N.D. Ill. 2011).

It is true that "every sale of property involves a transfer, but not every transfer is a sale." *In re Pacific Lumber*, 584 F.3d 229, 245 (5th Cir. 2009).  In the case at hand, although there are some features of a sale, this court concludes that this is a proposed reorganization, not a sale. Although there is some shuffling of interests under both Plans, there is not a true sale of the

15

Property as contemplated by § 363(b). Both Plans contemplate creation of new limited liability companies each holding interests in the reorganized debtor, which does resemble a sale transaction. Also, the transaction contemplated by the Plans would provide for some exchange in interests held in the Property, a different ownership structure, and new management. But the real property itself is not really being sold in this case. Essentially, this is a transfer of equity in the Debtors, not a sale of real property. It may be a close call, but the transactions contemplated by the Plans are best characterized as recapitalizations.

Given that the Plans would each consummate a recapitalization, not a sale, the Lender does not have any right under § 363 or otherwise to credit bid.

*C. The 1129(a) Issues*

CWCAM takes the position that the Plans are neither feasible nor proposed in good faith as required by § 1129(a) of the Code. With regard to feasibility, CWCAM argues that there are no binding sources of funding under the Plans and the Plans rely on unrealistic projections. The Plan Proponents put credible evidence before this court with regard to their projections, and this court does not agree that they are unrealistic. The witnesses for SAP and the Debtor had both been around the block before and appeared credible. Both Plan Proponents have financial parties with deep pockets that would be able to fund either plan.

However, the Heritage lease will shortly become a real issue, as it will soon be up for renewal. Heritage stated through counsel on the record that it does not support either Plan. The SAP Plan is conditioned on an agreement with Heritage to remain a tenant. Heritage's position affects feasibility, and this court agrees that the feasibility of both Plans is in question. But this court does not determine that the either plan is, in fact, not feasible under § 1129(a). This court

16

need not reach that issue, as neither plan is confirmable because § 1124(2) is not satisfied by either plan.

Both plans were presented in good faith. SAP's Plan is an obvious attempt to use the Bankruptcy Code in a lawful manner to gain control over property that may have potential upside.

The Debtor's Plan is a worthy attempt to preserve something for the TICs and to avoid adverse tax consequences.

The two Plan Proponents have spent considerable time and money on the Plans, have cooperated in discovery, and have substantial financial backers.

Nothing offered at the confirmation hearing indicates that either Plan was filed in bad faith.

## CONCLUSION

Courts like to confirm plans rather than preside over liquidations or foreclosures. Confirmation usually leaves something for everybody. However, in the present case, confirmation of either plan would violate an express provision of the Bankruptcy Code, § 1124(2), and would not be affirmed on appeal in this circuit.

It certainly would be better for the TICs if a plan were confirmed, preserving a chance of some recovery for them and avoidance of potential adverse tax consequences. While the court understands the TICs' situation and the possible repercussions of not confirming a plan, it cannot legally confirm either plan before it.

17

Both Plan Proponents spent a great deal of time in briefs and argument before this court challenging the decision of the Lender to object to their Plans rather than take a cure payment and the regular monthly payments until the note matures.

The Lender's primary witness, Mr. Thompson, explained that the decision to object to the Plans was an economic one. The Lender sees a path to quick repayment through foreclosure and sale of the Property rather than the risk of further defaults, even if the loan is cured on the effective date. Whether this decision is the correct one for the Lender is not this court's call.[5]

The problem may be a fundamental one with bankruptcies involving TICs. While a popular financing vehicle a few years back, such arrangements have fallen on hard times across the U.S., and non-consensual reorganization by TICs in the Bankruptcy Courts has largely failed. *See In re NNN Parkway 400 26, LLC*, Ch. 11 No. 8:12-bk-24593-TA (Bankr. C.D. Cal. Jan. 21, 2014) (denying confirmation to a TIC bankruptcy case with striking similarities to the case at bar); *see In re Geneva ANHX IV LLC*, 496 B.R. 888 (Bankr. C.D. Ill. 2013) (lifting the automatic stay because plan confirmation did not appear likely); *see In re Orchards Vill. Invs.*, No. 09-30893-rld11, 2010 WL 143707 (Bankr. D. Or. Jan. 8, 2010) (confirming a joint plan of reorganization, but denying a TIC-sponsored plan where the joint plan provided for a sale of debtor's interests in the real property and the TIC plan proposed a change of management and ownership would be had by certain new and old investors).

This Lender has been in litigation and negotiation with the TICs and has been unpaid for a substantial amount of time. This court terminated exclusivity to invite other parties to

---

[5] This is not to say that Mr. Thompson's testimony on some points was not concerning. During his deposition Mr. Thompson denied all knowledge of a deal with MAT, which was obviously in the works at the time he was being questioned. The existence of that agreement does not affect the Court's ruling. But an honest answer to the line of questions could have saved the Plan Proponents time and effort.

participate in negotiations with the lender and to file a plan that could be confirmed and to encourage the Debtor to be realistic in its attempts to resolve the case.  Although the parties have expended much time, effort, and money in the process, neither Plan Proponent has proposed a plan acceptable to the Lender or confirmable over the Lender's objection.

Accordingly, confirmation will be denied and the automatic stay is terminated, pursuant to the earlier order of this court.

###END OF MEMORANDUM OPINION###